UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                :

VLADIMIR LEON,                            :

                                               :

                            Plaintiff,        :       11-cv-08559 (NSR)
        -against-                    :      OPINION AND ORDER
                                               :

COLUMBIA UNIVERSITY MEDICAL CENTER,  :

                                             :

                            Defendant.      :
-----------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge

        Plaintiff Vladimir Leon ("Plaintiff") commenced this action pursuant to Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., the New York State Human Rights Law,

N.Y. EXEC L. §296, and the New York City Human Rights Law, N.Y. City Admin. Code §§8-

101 to 131 ("NYCHRL") against Defendant Columbia University Medical Center (the

"University" or "Defendant"), alleging that his termination from employment with Defendant

was due to race and national origin discrimination and that his discharge was in retaliation for

attempting to secure tuition benefits under a collective bargaining agreement between Columbia

University and Plaintiff's union.  Defendant counters that Plaintiff's termination was due to a

lack of grant funding available to support Plaintiff's position.

        Defendants now move, pursuant to Federal Rule of Civil Procedure 56, for summary

judgment, asserting there is no genuine issue of material fact and that Defendant is entitled to

judgment on all of Plaintiff's claims.  For the following reasons, Defendant's motion for

summary judgment is GRANTED.

## I.  Background

The facts are taken from the parties' Local Civil Rule 56.1 statements and supporting materials, and are not in dispute, except where noted.

Plaintiff Vladimir Leon is a Black male of Haitian descent.  He was hired by Columbia University in July 2006 as a Research Assistant in the Stroke Division of Columbia's Department of Neurology.  Defendant's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 (hereinafter "56.1"), ¶¶ 2.  Dr. Mitchell Elkind, an Associate Professor and Physician at Columbia, hired Plaintiff and supervised him throughout the duration of his employment.  *Id* at ¶¶ 3-4.  Plaintiff began reporting to Janet DeRosa ("DeRosa"), a Senior Staff Associate in the Stroke Division, in 2007.  *Id* at ¶ 6.

Plaintiff's primary employment responsibilities were related to the Northern Manhattan Study ("NoMaS"), an observational epidemiologic study of a closed cohort of patients aimed at assessing the risk factors and outcomes of stroke in the population living in the Northern Manhattan Area.  *Id* at ¶¶ 8-9.  Plaintiff's principal role with regard to NoMaS involved storing, processing, inventorying and shipping blood specimens, ordering supplies, maintaining laboratory equipment, and maintaining databases.  *Id* at ¶¶ 8, 13.  The NoMaS study is funded principally through a grant from the National Institutes of Health ("NIH"), which is renewed in five-year increments and is additionally resubmitted yearly as a non-competitive renewal application.  *Id* at ¶¶ 10-12.  The study is approximately sixty-nine percent Hispanic.  *Id* at ¶ 10. In addition to Mr. Leon, the study employed other research assistants whose main duties were to interact with the patients and gather information directly from patients.  *Id* at ¶¶ 24-25.

2

Accordingly, the research assistants in patient-related positions were required to be fluent in English and Spanish since 2006.  *Id* at ¶ 26.

Following the departure of Plaintiff's former supervisor in 2007, Plaintiff claims that he began to be bullied by the other employees, his co-workers in the study, particularly because he was Haitian.  *Id* at ¶ 32.  Plaintiff perceived that he was "regarded differently" by the other employees, who were Dominican.  Pl.'s Response to 56.1 ¶ 30.   Allegedly, the Dominican employees belittled Plaintiffs' Spanish speaking ability, made racial comments about blacks being less intelligent, and comments within Plaintiff's earshot about President Obama.  56.1 at ¶ 32.  Plaintiff reported these occurrences to DeRosa sometime in 2008 or 2009 and was told that he should "not worry about it," and that she "would take care of it."  *Id* at ¶ 33.

In March 2009, Plaintiff was approached by Elizabeth Wang, the Division Administrator, in the hallway, who questioned why Plaintiff had a purchasing card.  Pl.'s Response to 56.1 ¶ 30.  When Plaintiff responded that Dr. Elkind had provided the card to Plaintiff to make necessary purchases for the lab, Ms. Wang told Plaintiff that he was not authorized to have a purchasing card and removed it from his possession.  *Id.*  Plaintiff believes that following this incident, "Ms. Wang and others in the hallway laughed at his discomfort."  *Id.*  Plaintiff wrote an email to DeRosa regarding the purchasing card and the way he was treated by Ms. Wang, which he described as "punishment" and "a discriminatory decision."  *Id.*  In a series of emails between Plaintiff, DeRosa, Dr. Elkind and Consuelo Mclaughlin, DeRosa explained that there was a change in Department policy in order to streamline purchasing activities in the Stroke Division, which was why Plaintiff would no longer hold a purchasing card.  Gerard Dec. Ex. 2.

Plaintiff first approached DeRosa sometime during the spring semester of 2010[1] to ask that she sign a form entitled "Job-Related Graduate Course Certification Form" certifying that certain classes he was taking at Columbia be granted preferential tax treatment.  DeRosa Dec. Ex. C.  As a Columbia employee and 1199 member, Plaintiff was entitled to certain tuition assistance benefits in connection with courses taken at Columbia, if the courses were deemed to be job-related.  56.1 ¶ 34.  In April 2010, after Plaintiff left the form for DeRosa's signature, she replied by email that she would need more information from Plaintiff before she would sign the form.  DeRosa Dec. Ex. B.  After meeting on April 26, 2010, DeRosa reviewed further information and ultimately refused to approve one of Plaintiff's courses as job-related.  Subsequently, Plaintiff went to Dr. Elkind with the form, explained that DeRosa would not sign the form and asked Dr. Elkind to sign it, which he did.

In 2007, the grant renewal application submitted to NIH provided that the study would not draw, process, or inventory blood past March 2009.  56.1 ¶ 16.  Although the grant funding for his activities had run out, Plaintiff remained in his position past March 2009 through carryover funding from NoMaS as well as other available funds.  *Id* at ¶ 19.  The sub-award agreement for the year beginning in April 2010 and running through May 2011 provided that none of Plaintiff's salary would be funded through the grant from NIH.  *Id* at ¶ 20.  As a matter of Columbia University policy, faculty must obtain outside funding to support research staff.  *Id* at ¶ 22.  Dr. Elkind made the decision to end Plaintiff's employment because of lack of funding and he communicated that decision to DeRosa in or about February or March 2010.  *Id* at ¶¶ 21-23.

---

[1] Defendant states that the first request was made in April 2010.  Plaintiff believes he first approached DeRosa in January 2010.

After the decision was made to terminate Plaintiff's employment, the union representative, Bennett Battista, without authorization from Defendant, called Plaintiff and told him that he was being fired. *Id* at ¶ 38. Upon receiving this news, Plaintiff called Dr. Elkind and during the course of the conversation, Plaintiff said that the way his termination had been handled was unprofessional and suggested that this kind of treatment is why people commit suicide. *Id* at ¶ 39; Leon Tr. 131:11-139:19. Dr. Elkind then reported Plaintiff's comment to the Department Administrator, causing management to become concerned. 56.1 ¶ 40. Plaintiff was referred to the Employee Assistance Program, the result of which was that the University asked Plaintiff to provide documentation that he was fit to continue working during his four-week notice period. *Id* at ¶ 41. Although Plaintiff submitted two doctor's notes saying he was physically fit, he did not provide any medical confirmation that he was psychologically fit to work. *Id* at ¶ 42. Plaintiff was unaware that the University required notification of his psychological fitness. Due to his failure to provide documentation satisfactory to the University, Plaintiff was not allowed to work the duration of his notice period. Leon Dec. ¶ 20.

At the time of Plaintiff's termination, there were four other research assistants in the Stroke Division who were more junior than Plaintiff. Pl.'s Response to 56.1 ¶ 24; Gerard Dec. Ex. 6. The more junior research assistants performed patient-related research, meaning that they interacted directly with the patient cohort. 56.1 ¶ 26. Although Plaintiff can understand some Spanish, he is not fluent in Spanish, a requirement of the other research positions. *Id* at ¶ 27. According to the Collective Bargaining Agreement between Columbia and Plaintiff's Union, 1199 United Healthcare Workers East, employees in a research project who have the same job classification are to be laid off in reverse order of seniority. Gerard Dec. Ex. 1, COL 0000449. However, "the placing of one employee in another employee's job in the same job classification

5

for the purpose of retaining the more senior employee shall be permitted to occur only . . .

provided the more senior employee is able to perform the available work." *Id.*

Although Plaintiff has attempted to apply for positions with Columbia University since

his discharge, he has not received any response regarding any of them.

## II. Discussion

### A. Summary Judgment Standard

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil

Procedure, which states, in pertinent part, "The court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden

of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or

declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving

party may support an assertion that there is no genuine dispute by "showing . . . that [the]

adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving

party to raise the existence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(A);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v.

Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators,

Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).

Courts must "construe[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v.* Catrett, 477 U.S. 317, 322 (1986). The moving party "must set forth specific facts showing that there is a genuine issue for trial." *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 244 (S.D.N.Y. 2001).

"Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

### B.  Plaintiff's Employment Discrimination Claims

"[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation." *Bernard*

7

*v. J.P. Morgan Chase Bank N.A.*, No. 08 Civ. 4784, 2010 WL 423102, at *1 (S.D.N.Y. Feb. 5, 2010). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 519-20 (S.D.N.Y. 2007) (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Additionally, "[s]ummary judgment still can be an appropriate mechanism for resolving NYCHRL claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 111-12 (2d Cir. 2013).

### i.  Title VII

Title VII provides that it is an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  Thus, "[a]n employment decision . . . violates Title VII when it is based in whole or in part on discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citation omitted).

"In cases . . . where there is no direct evidence of discrimination, we apply the three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*[.]" *Singer v. Tuffey*, 66 Fed. App'x 232, 235 (2d Cir. 2003).[2]  The framework set forth in *McDonnell Douglas* requires that the plaintiff first establish a prima facie case of discrimination.  To establish a prima facie case of discrimination, plaintiff must show that (1) he is part of a protected class, (2) he was qualified for

---

[2] The outcome for Plaintiff's claims brought under the New York State Human Rights Law will be the same. "Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" *Hyek v. Field Support Servs., Inc.*, 461 Fed. App'x 59, 60 (2d Cir. 2012) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n. 1 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 140–41 (2d Cir. 2006)).

the position, (3) he suffered an adverse employment action, and (4) the circumstances

surrounding the adverse employment action give rise to an inference of discrimination.

*McDonnell Douglas*, 411 U.S. 792, 802 (1973); *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.

2003); *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985).  In the context of employment

discrimination, the burden of establishing a prima facie case is minimal.  *St Mary's Honor Ctr. v.*

*Hicks*, 509 U.S. 502, 506 (1993); *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).  If

a prima facie case is established, "a presumption of discrimination arises and the burden shifts to

the defendant, who must proffer some legitimate, nondiscriminatory reason for the adverse

action." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).  "This burden is one of

production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  Finally, if the defendant meets its burden of

production, the burden again shifts to the plaintiff to show "that a discriminatory reason more

likely motivated the employer or . . . by showing that the employer's proffered explanation is

unworthy of credence."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

   "It is not sufficient, however, for a plaintiff merely to show that he satisfies '*McDonnell*

*Douglas's* minimal requirements of a prima facie case' and to put forward 'evidence from which

a factfinder could find that the employer's explanation . . . was false.'" *Gray v. Lutheran Soc.*

*Servs. of Metro. New York, Inc.*, No. 04-CV-2843, 2006 WL 1982859, at *4 (E.D.N.Y. July 13,

2006) (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000)).  What the court

must ultimately determine is whether there is sufficient evidence in the record that supports an

inference of discrimination so that a reasonable trier of fact could find for plaintiff on the

decisive issue.  *Id.*  "[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is

9

to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." *James*, 233 F.3d at 157.

### 1.   Failure to Establish a Prima Facie Case

The parties do not dispute that Plaintiff is a member of a protected class, that he was qualified for his job, or that he was discharged from his position.  As the first three prongs of Plaintiff's prima facie case are satisfied, the only issue for Plaintiff in establishing a prima facie case is whether the circumstances suggest an inference of discrimination.

"Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004).  In order to distinguish between comments that can be considered "stray remarks" and those that indicate a discriminatory intent, an important factor is the position of individual making the remark, especially in relation to the plaintiff.  *Id* at 519.  ("In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative 'stray remark,' a court should consider the following factors: (1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process.").

Plaintiff states that certain discriminatory comments were directed at Plaintiff by other employees working in the NoMaS study.  Specifically, Plaintiff states that other Dominican employees belittled Plaintiff's Spanish speaking ability and made racial comments within earshot of Plaintiff about blacks being less intelligent.  Some of the comments were made in Spanish,

although Plaintiff states that he understood their meaning.  Pl. Mem. Opp'n Summ. J. 7; Leon Tr 94:19-95:16.  Assessing these comments in context, however, there is no evidence of a nexus between the discriminatory nature of the comments and Plaintiff's discharge.  For one, the comments were made by Plaintiff's co-workers and not by anyone in a supervisory capacity or anyone close to the decision-making process.  There is no indication that Plaintiff's supervisors, Dr. Elkind or DeRosa, made any comments regarding Plaintiff's race or national origin.  Where there is no evidence of discriminatory animus by the decision-makers in an adverse employment action, there is little to suggest that there was discrimination.  *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 309 (S.D.N.Y. 2000) ("[I]t is fatal to plaintiffs' case that they [do not allege that] any of the decision-makers who were responsible for their termination harbored discriminatory feelings for them."); *Townsend v. Clairol, Inc.*, 26 Fed. App'x 75, 78 (2d Cir. 2002) ("Stray or isolated remarks cannot constitute proof of racial animus on the part of the employer unless the alleged statement has some causal connection to the decision to terminate the plaintiff's employment.").

Although Plaintiff asserted that "his Supervisors chose to side with the other employees," Pl. Mem. Opp'n Summ. J. 12, after he reported the comments made by the other employees, there is no indication from the record that this is true.  Additionally, Plaintiff testified that he did not recall any further comments being made after he voiced his concerns.  Finally, the comments were made prior to 2009, more than a year before Plaintiff's termination, further distancing any purported nexus between the comments and Plaintiff's discharge.

There are two other incidents that Plaintiff believes evidences a discriminatory animus toward Plaintiff leading to his dismissal.  The first occurred in March 2009 when, Elizabeth Wang, the Division Administrator, approached Plaintiff in the hallway, removed a purchasing

11

card from his possession, and publicly questioned his authority to have one in the first place, an incident which caused several people to allegedly "laugh[] at [Plaintiff's] discomfort." Pl.'s Response to 56.1 ¶ 30.  Plaintiff brought this exchange to DeRosa's attention, as well as to Consuelo McLaughlin, the union representative, and Dr. Elkind, but he abandoned his complaints after being told that he should "not worry about it."  Although Plaintiff believed the removal of his purchasing card to be a "discriminatory decision," nothing from this exchange indicates that the situation even impliedly occurred because of a discriminatory animus against Plaintiff due to his race or national origin.  The evidence on the record suggests that there was a change in University policy regarding purchasing cards, and that change affected Plaintiff. Gerard Dec. Ex. 2.  Further, there is no evidence that Ms. Wang had any input in the decision to terminate Plaintiff's employment.

The second incident was with regard to Plaintiff's request for DeRosa's signature on a tuition benefit tax exemption form.  DeRosa Dec. Ex. C.  Plaintiff asked DeRosa to approve Plaintiff's request that certain courses he was taking be considered job-related, and therefore receive beneficial tax treatment.[3]  According to Plaintiff, he first made this request in January 2010[4] and although DeRosa apparently approved an identical request from Norbelina Disla, another employee in the study, she did not sign Plaintiff's form.  In a meeting in April 2010, DeRosa requested that Plaintiff provide her more information so that she could assess whether the courses were, in fact, related to his job.  DeRosa did not "refuse" to sign the form at this

---

[3] There is confusion as to whether Plaintiff was entitled to take courses without paying tuition, Leon Dec. ¶3, or whether the courses, if job-related, would be considered taxable income, DeRosa Dec. Ex. C.  The document states that the latter is the case.  *Id* at COL – 000551 ("[T]uition exemption benefits for graduate courses are taxable unless courses are job related.").  In any event, it does not change the analysis or outcome.

[4] DeRosa believes the first request from Plaintiff was in April 2010. 56.1 ¶35.

point, but rather requested further information to ensure that she was not erroneously approving his request without verification.  DeRosa was ultimately not satisfied that the courses he was taking were job-related and therefore told Plaintiff that she would not sign the form.  Plaintiff believes this action was discriminatory because DeRosa approved Ms. Disla's form without incident, and Ms. Disla is Dominican, which Plaintiff suggests is evidence of preferential treatment toward the Dominican employees.  Plaintiff further complains generally of "disparity in treatment . . . from management, and [] that Janet DeRosa was taking the side of the Dominican employees at [Plaintiff's] expense."  Leon Dec. ¶13.  However, the simple fact is that there is nothing more than conjecture to support Plaintiff's claims.  DeRosa even had a discussion with a Human Resources representative regarding the requirements for the tax exemption and drafted responses that she would provide on Plaintiff's form.  DeRosa Dec. Ex. D, E.  If her intention was to refuse Plaintiff outright, there is no reason why she would have taken these steps.  "[A] mere subjective belief that [plaintiff] was discriminated against because of . . . race . . . cannot sustain a charge of race discrimination."  *Baptiste v. Cushman & Wakefield*, No. 03 Civ. 2102(RCC), 2007 WL 747796, at *7 (S.D.N.Y. Mar. 7, 2007).

The Second Circuit has noted that "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to h[im] an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 92 (2d Cir. 2000); *Cordell v. Verizon Comm., Inc.*, 331 F. App'x 56 (2d Cir. 2009) (affirming dismissal of race and national origin discrimination claims because Plaintiff could not overcome the same actor inference). "This is especially so when the firing has occurred only a short time after the hiring." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).  It is not the case, however, that "a plaintiff may never prove discrimination when the same individual has

made the hiring and firing decisions." *Douglas v. M. Swift & Sons, Inc.*, 371 F. Supp. 2d 137,

145 (D. Conn. 2005).  This so-called same actor inference is implicated here.  Plaintiff was hired

by Dr. Elkind in 2006 and in 2010, it was Dr. Elkind who made the decision to terminate his

employment. 56.1 ¶¶ 3, 23.  The two decisions were made fairly remote in time and therefore,

the same actor inference is not outcome-determinative.  Nonetheless, it does somewhat "suggest

that invidious discrimination was unlikely."  *Grady*, 130 F.3d at 560.  In conjunction with the

lack of evidence of any race or national origin-related comments or actions directed at Plaintiff

by persons with supervisory or decision-making capacity prior to Plaintiff's termination, the

same actor inference solidifies the fact that Plaintiff cannot establish a prima facie case for

employment discrimination.

Given the foregoing, the circumstances surrounding Plaintiff's termination from

employment at Columbia University do not give rise to any inference that discrimination was

any factor in his termination.  Plaintiff, accordingly, has not established a prima facie case of

discrimination under Title VII.

### 2.   Defendant's Non-Discriminatory Proffered Reason for Termination

Even if Plaintiff were to be able to establish a prima facie case of discrimination,

Defendant has proffered a non-discriminatory reason for Plaintiff's discharge that Plaintiff

cannot rebut.  Defendant alleges, and the evidence on the record supports, that the reason

Plaintiff was discharged from his duties in connection with the NoMaS study was because there

was no longer funding for Plaintiff's position.  56.1 ¶ 16, 23; Friedfel Dec. Ex. F at

COL0000131.  Indeed, Plaintiff does not dispute the fact that the decision to end Plaintiff's

employment with Columbia University was made by Dr. Elkind and was due to the lack of

external funding.  56.1 ¶ 23.  The lack of funding for a research position in a study funded by

receipt of grants unquestionably meets Defendant's burden of production of a legitimate business reason for Plaintiff's termination.  *See Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921-22 (2d Cir. 1981) (employee may be discharged "on the basis of subjective business judgments, for any reason that is not discriminatory") (citation omitted); *see also Gray v. Lutheran Social Servs. of Metropolitan N.Y., Inc.*, No. 04-CV-2843, 2006 WL 1982859, at *5 (E.D.N.Y. July 13, 2006) (loss of HUD funding for position occupied by plaintiff considered a non-discriminatory reason for termination).

### 3.  No Evidence of Pretext

Plaintiff intimates that two occurrences suggest that the reason proffered by Defendant for Plaintiff's discharge is pretextual.  First, Plaintiff believes that instead of being fired, he should have been given a different research assistant position because he was less junior than others working on the study and the fact that he was not suggests that his termination was discriminatory.  Second, Plaintiff alleges that the removal of Plaintiff from Columbia's campus following his termination due to questions about his medical fitness for work suggests invidious discrimination by Defendant.

Although there were other research assistants who were more junior than Plaintiff at the time of his termination, those individuals were fluent in Spanish, a requirement to hold a patient-related research assistant positions.  Plaintiff's tasks for the duration of his employment were limited to the lab and did not involve interactions with the patient cohort of the study. Approximately 69% of the patient cohort is Hispanic and predominantly Spanish-speaking, and Plaintiff is not fluent in Spanish.  Plaintiff states that while all of the other research assistants were fluent in Spanish, 31% of the patient cohort was English-speaking and since Plaintiff has

work experience related to the tasks performed the other research assistants, he should have been placed in a different position instead of being fired.

The requirement that the research assistants who were in contact with patients be fluent in Spanish existed from the inception of the study and was considered necessary by Dr. Elkind. Elkind Tr. 26:17-24.   Plaintiff believes that "there was no necessity that all Research Assistants be fluent in Spanish in order to perform the work required."  56.1 ¶24. However, "'[the court's] role is to prevent unlawful hiring practices, not to act as a "super personnel department" that second guesses employers' business judgments.'" *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)); *Abraham v. New York City Dept. of Educ.*, 398 Fed. App'x 633, 635 (2d Cir. 2010) ("[E]mployers, not the court, determine what qualifications are necessary.").  In the context of summary judgment, "[a] plaintiff is not entitled to get his or her case before a jury by contending that the demands of the employer were not reasonably related to the performance of the job." *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997).  There is no indication that the Spanish fluency requirement was a qualification implemented in bad faith to keep Plaintiff from occupying one of the positions and therefore, there is no indication that removing Plaintiff from his position instead of placing him in a research assistant position that he was not qualified for was discriminatory. *Id* ("Absent a showing by the plaintiff that the employer's demands were made in bad faith, an employer who is sued on allegations of [] discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury.").  Further, Plaintiff's subjective belief that "there would be no adverse impact," Pl. Mem. in Opp. 6, if he occupied a patient-

centric research position is not relevant to the determination, as the court may not substitute its judgment for that of the University.

In an email to Nancy Fish, William Innes, the Chief Human Resources Officer,[5] stated that it was a "complication" that Plaintiff was laid off before more junior Research Assistants and stated, "we need to make sure the job descriptions of the 4 people not getting laid off are jobs that Vladimir cannot do." Gerard Dec. Ex 9, COL 0000399. Plaintiff argues that this email suggests an intent, on the part of the University, to force him out of his position. However, reading the email in the context of the surrounding circumstances, it is clear that the email is the human resources department ensuring that the University is in compliance with Plaintiff's rights under the collective bargaining agreement and performing their duties in connection with a dismissal.

Plaintiff also believes that discriminatory intent can be inferred from the manner in which his termination was carried out. After Plaintiff's comment that the way in which his termination was handled was treatment that explains "why people commit suicide," Dr. Elkind felt compelled to report the statement, which alerted management and raised concerns. Plaintiff was then required to provide medical documentation to verify his fitness for duty during his four-week notice period. Plaintiff did not produce a note that was satisfactory to the University and was accordingly not allowed to return to the University during the remainder of his notice period. Given the sensitive nature of a comment alluding to suicide in the way Plaintiff's comment did, even if made in jest or with no underlying intent, an employer is justified in responding cautiously where the circumstances warrant doing so. Even if the steps taken by the University

---

[5] At the time of Plaintiff's lay off, Mr. Innes was the Associate Vice Dean for Human Resources at the College of Physicians and Surgeons. Innes Tr. 6:4-16.

17

were more than necessary, there remains the fact that no inference of discrimination can be drawn from the circumstances.  For one, Plaintiff had already been discharged and the requests from the University came from employees other than those implicated in the termination decision.  Further, the actions of the University in response to a delicate situation should not be presumed to have an ulterior motive under the circumstances.

Ultimately, Plaintiff does not establish that there are sufficient facts from which an inference of discrimination can be drawn such that a verdict in Plaintiff's favor could be sustained.  Where such is the case, summary judgment is warranted.  *James*, 233 F.3d at 157.

### ii.  NYCHRL

Following the amendment of the New York City Human Rights Law by the Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005) (the "Restoration Act"), "the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citation and internal quotations omitted); *Loeffler v. Staten Island University Hospital*, 582 F.3d 268, 278 (2d Cir. 2009) (same). The Second Circuit instructs that "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, . . . construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.' Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Id* (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)); *see also Abraham*, 398 Fed. App'x at 635.

The pertinent section of the New York City Human Rights Law provides,

18

> It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y. City Admin. Code §8-107.  Under the NYCHRL, "[t]he [inference of discrimination prong] of the prima facie case is satisfied if a member of a protected class was treated differently than a worker who was not a member of that protected class." *Williams v. Regus Mgmt. Group, LLC*, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011).  A plaintiff must, however, still be able to "link the adverse employment action to a discriminatory motivation," and where a plaintiff is not able to do so, the claims must fail.  *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 258 (E.D.N.Y. 2012); *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 872 N.Y.S.2d 27, 34-35 (1st Dep't 2009).

The outcome in this case under the NYCHRL is the same as under Title VII and the NYSHRL.  For the reasons fully explained above, there is no evidence that links Plaintiff's termination to discriminatory intent.  Therefore, Defendant's summary judgment motion on Plaintiff's employment discrimination claim under the NYCHRL must be granted.

### iii.  Failure to Promote

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003); *Preuss v. Kolmar Labs., Inc.*, No 10-CV-6375, 2013 WL 4766395, *14 n. 18 (S.D.N.Y. Sept. 4, 2013).  Plaintiff has offered no evidence to support Plaintiff's discriminatory failure to promote claim and does not address Defendant's argument in its Motion for Summary Judgment that Plaintiff's failure to promote claim should be dismissed.  Based on this alone, the Court may dismiss this claim.

*Taylor*, 259 F. Supp. 2d at 75.  In any event, the Court finds no evidence in the record to support Plaintiff's claim.

As part of establishing a prima facie case for failure to promote, a plaintiff must allege that he "applied for and was qualified for a job for which the employer was seeking applicants." *Brown v. Coach Stores*, 163 F.3d 706, 710 (2d Cir. 1998) (quoting *McDonnell Douglas*, 411 U.S. 802).  "The law requires a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom."  *Gupta v. New York City School Constr. Auth.*, 305 F. App'x 687, 689 (2d Cir. 2008) (citing *Brown*, 163 F.3d at 710).  In this case, Plaintiff points to one opening, for which "Jorge" was hired that Plaintiff expressed interest in, but Plaintiff never actually applied for the job.  Leon Tr. 220:13-17.  Because Plaintiff cannot show that he applied for a position and was rejected from it, he cannot make out a prima facie case for failure to promote.

### iv.  Failure to Rehire

Plaintiff very cursorily refers to his failure to rehire claim in his opposition to Defendant's motion for summary judgment, stating only that "he has attempted to apply for open positions at Columbia after being laid off, [but] he has received no response from Defendant." Pl. Opp'n to Mot. 10.  Plaintiff, however, proffers no support for his claim, specifically by failing to point to any open position for which he was qualified. *Finkelshteyn v. Staten Island Univ. Hosp.*, 687 F. Supp. 2d 66, 84 (E.D.N.Y. 2009) ("Fatal to this claim is Finkelshteyn's basic failure to show, as he must, the actual availability of an open employment position.").

Further, Defendant has a legitimate reason for the failure to rehire Plaintiff in that his termination was due to a failure to provide the University with documentation of his fitness for employment.  *McMillin v. United Airlines*, No. 08-CV-6450T, 2008 WL 1744549, at *2

(W.D.N.Y. Apr. 11, 2008) ("Because plaintiff was not eligible for re-employment with United, she cannot, as a matter of law, establish that she was discriminated against on the basis of a disability when United refused to rehire her."); *Taylor v. Eckerd Pharmacy*, No. 05-CV-5250, 2007 WL 2816189, at *4 (E.D.N.Y. Sept. 26, 2007) ("Eckerd has proffered a legitimate, non-discriminatory reason for declining to re-hire Taylor, namely his failure to provide Eckerd with documentation regarding the dismissal of his charges.").

### C.  Plaintiff's Retaliation Claim

Retaliation claims are also analyzed under the burden-shifting framework set forth in *McDonnell Douglas*.  *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 410 (2d Cir. 2011) ("We analyze both federal and state law retaliation claims under the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green*.").  Plaintiff must first show that (1) he engaged in protected activity, (2) his employer was aware of the activity, (3) the employer took adverse action, and (4) if he had refrained from engaging in the protected activity, no adverse action would have been taken.  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006).  "Under the NYCHRL the elements of retaliation are identical except that the plaintiff need not prove any "adverse" employment action; instead, he must prove that something happened 'that would be reasonably likely to deter a person from engaging in protected activity.'" *Jimenez v. City of N.Y.*, 605 F. Supp. 2d 485, 528 (S.D.N.Y. 2009) (quoting N.Y.C. Admin. Code § 8–107(7)).

In his Complaint, Plaintiff alleges that his discharge was motivated by "resent" on the part of the University that Plaintiff challenged DeRosa's failure to sign his tuition-related tax form.  With respect to the first prong of the prima facie case, "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."  *Wright v.*

21

*Monroe Cmty. Hosp.*, 493 Fed. App'x 233, 236 (2d Cir. 2012). "Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e–3(a)). Plaintiff's request to have a tuition form signed by DeRosa is not a protected activity. This is not a right protected by Title VII and therefore, it cannot form the basis of a retaliation claim.

In Plaintiff's response to Defendant's motion for summary judgment, he intimates that his retaliation claim is based on the fact that he complained on several occasions regarding his treatment in the workplace to his superiors. Although the court "need not reach the merits" of a claim made for the first time in opposition to a motion for summary judgment where it was absent from the Complaint and Plaintiff makes no move to amend, *Greenridge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006), the Court nonetheless finds Plaintiff's claims to be without merit.[6]

Where there is a large gap of time between the purported protected activities and the alleged adverse actions, there is a lack of causation. *Fosco v. City Univ. of N.Y.*, No. 09 Civ. 7173(WHP), 2012 WL 75189, at *3 (S.D.N.Y. Jan. 5, 2012) ("Temporal proximity creates a genuine fact issue only when the adverse action is "very close" in time to the protected conduct."); *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F.Supp.2d 257, 275 (S.D.N.Y.2007) ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to

---

[6] Plaintiff even testified that he believed his discharge to be in retaliation for his request that his tuition exemption form be signed, making no mention of retaliation based on the complaints he made. Leon Tr. 159:10-15; 160: 12-20.

three months between the protected activity and the adverse employment action does not allow for an inference of causation.").  Thus, complaints made by Plaintiff in 2008 and 2009 regarding the comments made by Plaintiff's Dominican cowokers and about Ms. Wang and her treatment of Plaintiff, are too remote in time to be a plausible basis for a retaliation claim.

The only remaining complaint made by Plaintiff was to Dr. Elkind in reference to the fact that DeRosa refused to sign his tuition form.  Under the second prong of the prima facie case, the employer must be aware of the plaintiff's protected activity.   "[I]mplicit in the requirement that the employer was aware of the protected activity is the requirement that the employer understood, or could have reasonably understood, that the plaintiff's complaints, constituting the protected activity, were based on conduct prohibited by Title VII." *Rosioreanu v. City of N.Y.*, 526 Fed. App'x 118, 120 (2d Cir. 2013) (internal citations and alterations omitted).  When Plaintiff complained to Dr. Elkind about the fact that DeRosa would not sign his form as requested, Plaintiff told Dr. Elkind that he believed he was being treated differently than another employee who was seeking the same tuition benefits, but he did not make clear that his treatment was race or national origin-based.   Further, there is no evidence to establish the causation element between the protected activity and the adverse employment determination, most markedly because when Plaintiff complained to Dr. Elkind the decision to terminate Plaintiff's employment had already been made.

## Conclusion

Accordingly, the Court grants Defendant's motion for summary judgment dismissing Plaintiff's employment discrimination claims under Title VII, the New York State Human Rights Law, and the New York City Human Rights Law, failure to rehire, failure to promote, and retaliation claims.

Dated:      December 17, 2013                         SO ORDERED:
            White Plains, New York

                                        _____ 12/17/13
                                        NELSON S. ROMÁN
                                        United States District Judge

24